IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JAMES G. THOMAS,
KERRY THOMAS,
GREGORY NORLIN,
NANCY NORLIN and
SIERRA CLUB,

        Plaintiffs,

vs.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
STEPHEN L. JOHNSON, Administrator,
and JOHN B. ASKEW, Regional
Administrator, Region VII of the United
States Environmental Protection Agency,

        Defendants.

No. C06-0115

**REPORT AND
RECOMMENDATION**

————————————

**TABLE OF CONTENTS**

*I.*     *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*    *ISSUE PRESENTED*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*   *STATUTORY FRAMEWORK*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV.*   *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *A.*    *1998 Section 303(d) List*. . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *B.*    *2002 Section 303(d) List*. . . . . . . . . . . . . . . . . . . . . . . . . . 7
        *C.*    *2004 Section 303(d) List*. . . . . . . . . . . . . . . . . . . . . . . . . . 9

*V.*     *STANDARD OF REVIEW*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
      A.   **Did EPA Fail to Consider Important Facts and Information?**. . . . .  11
           1.   *Failure to Include Waters Listed on the Section 305(b)*
                *Report*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
           2.   *Failure to Include Waters Where No Pollutants Had Been*
                *Identified*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
           3.   *Justification for Delisting of Certain Waters*. . . . . . . . . . .  17
      B.   **Did EPA's Approval Improperly Address Iowa's Credible**
           **Data Law?**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      C.   **Was EPA's Approval Contrary to the Clean Water Act?**. . . . . . . .  21
      D.   **Did EPA's Approval Improperly Exclude "Evaluated" Waters?**. . . .  23

VII.  SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

VIII. RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by the Plaintiffs on August 10, 2006, and the Answer (docket number 8) filed by the Defendants on October 12, 2006. Plaintiffs seek declaratory judgment, an order setting aside certain action taken by the United States Environmental Protection Agency ("EPA"), and judgment for attorney fees and court costs. Defendants resist Plaintiffs' requests.

On July 23, 2007, the District Court referred the matter to the undersigned United States Magistrate Judge for a Report and Recommendation. *See* Order (docket number 46). The matter is deemed submitted on Plaintiffs' Brief (docket number 33), EPA's Memorandum in Opposition (docket number 42), and the Reply Brief (docket number 45) filed by Plaintiffs.

## II. ISSUE PRESENTED

On May 26, 2005, pursuant to federal statutory and regulatory requirements, the Iowa Department of Natural Resources ("IDNR") submitted to EPA an Integrated Report, listing waterbodies found in Iowa, including those categorized as "impaired by a pollutant" (commonly known as the "Section 303(d) list"). The EPA partially approved and partially

disapproved IDNR's list of impaired water segments. Plaintiffs[1] claim that EPA's decision to partially approve Iowa's Section 303(d) list was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### III. STATUTORY FRAMEWORK

The Federal Water Pollution Control Act, commonly referred to as the Clean Water Act ("CWA" or "the Act"), was substantially amended in 1972, with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve this objective, the Act established "national goal[s]" of eliminating the discharge of pollutants into the navigable waters by 1985 and attaining "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water" by July 1, 1983. 33 U.S.C. § 1251(a)(1) and (2). The Act also identifies several "national polic[ies]," including a "national policy that the discharge of toxic pollutants in toxic amounts be prohibited" and a "national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution." 33 U.S.C. §§ 1251(a)(3) and (7).

In order to carry out the purposes of the Act, the CWA requires states to establish water quality standards. 33 U.S.C. § 1313(a). The water quality standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A). At least once every three years, the state must hold public hearings for the purpose of reviewing applicable water quality standards and modify the standards, if appropriate. 33 U.S.C. § 1313(c)(1). Any new or revised water quality standard must be approved by EPA. 33 U.S.C. § 1313(c)(3).

---

[1] Plaintiffs are four individuals who reside in Jones County, Iowa, and live near Buffalo Creek, and Sierra Club, a non-profit corporation with approximately 6,000 members in the State of Iowa.

Except when authorized by law, "the discharge of any pollutant by any person" is unlawful. 33 U.S.C. § 1311(a). However, EPA, or a state authorized by EPA, may issue a permit for the discharge of a pollutant, pursuant to the National Pollutant Discharge Elimination System. 33 U.S.C. § 1342. To carry out its objectives, the CWA requires the establishment of "effluent limitations" for public and private point sources.[2] 33 U.S.C. § 1311(b). Where a waterbody fails to meet the applicable water quality standard notwithstanding the effluent limitations, however, the state is required to list the non-complying waters.

> Each State shall identify those waters within its boundaries for which the effluent limitations required by Section 1311(b)(1)(A) and Section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters.

33 U.S.C. § 1313(d)(1)(A). This list is commonly referred to as the "Section 303(d) list."[3]

The individual waters identified on the Section 303(d) list are referred to as Water Quality-Limited Segments ("WQLSs").[4] 40 C.F.R. § 130.7. After considering the

---

[2] The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture. 33 U.S.C. § 1362(14).

[3] The reference to "Section 303(d)" is a reference to the original section number found in the Clean Water Act.

[4] A "Water Quality Limited Segment" is defined in the EPA Regulations as "[a]ny segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 (continued...)

"severity of the pollution and the uses to be made of such waters," the state must establish a priority ranking for the WQLSs. 33 U.S.C. § 1313(d)(1)(A). In addition, and in accordance with the priority ranking, the State must establish the "total maximum daily load" ("TMDL") for each WQLS.[5] 33 U.S.C. § 1313(d)(1)(C). Thus, if the regulation of point source discharges does not achieve the necessary level of water quality, then the waterbody must be placed on the Section 303(d) list and a TMDL must be established, *Sierra Club v. Meiburg*, 296 F.3d 1021, 1025 (11th Cir. 2002). In determining the TMDL, however, the State must consider pollutants from both point sources and nonpoint sources. 40 C.F.R. § 130.2(i). The TMDL must be "established at a level necessary to implement the applicable water quality standards" and include a "margin of safety." 33 U.S.C. § 1313(d)(1)(C).

Regulations adopted by the Environmental Protection Agency provide the states with guidance regarding the preparation of a Section 303(d) list. In preparing its Section 303(d) list, each state is required to "assemble and evaluate all existing and readily available water quality-related data and information." 40 C.F.R. 130.7(b)(5). In establishing a TMDL for each waterbody impaired by point source pollution, the state must "take into account critical conditions for stream flow, loading, and water quality parameters." 40 C.F.R. § 130.7(c)(1).

---

[4](...continued)
of the Act." 40 C.F.R. § 130.2(j).

[5]The "total maximum daily load" is defined in the EPA regulations as "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). "Wasteload allocation" is defined as "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h). "Load allocation" is defined as "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g).

Each state is then required to submit its Section 303(d) list to the EPA for approval or disapproval. 33 U.S.C. § 1313(d)(2). The Section 303(d) lists must be submitted to the EPA on April 1 of every even-numbered year. 40 C.F.R. § 130.7(d)(1). (The Regulations do not require submission of a Section 303(d) list for the year 2000.) The Regional Administrator of the EPA must either approve or disapprove the WQLS listing and the TMDLs not later than thirty days after the date of submission. 33 U.S.C. § 1313(d)(2). 40 C.F.R. § 130.7(d)(2).

In addition to submitting its Section 303(d) list, each state must provide EPA with documentation to support its determination to list or not to list a particular waterbody. 40 C.F.R. § 130.7(b)(6). This documentation must include at a minimum:

> (i)     A description of the methodology used to develop the list; and
> (ii)    A description of the data and information used to identify waters, including a description of the data and information used by the State as required by § 130.7(b)(5); and
> (iii)   A rationale for any decision to not use any existing and readily available data and information for any one of the categories of waters as described in § 130.7(b)(5); and
> (iv)   Any other reasonable information requested by the Regional Administrator. Upon request by the Regional Administrator, each State must demonstrate good cause for not including a water or waters on the list. Good cause includes, but is not limited to, more recent or accurate data; more sophisticated water quality modeling; flaws in the original analysis that led to the water being listed in the categories in § 130.7(b)(5); or changes in conditions, e.g., new control equipment, or elimination of discharges.

40 C.F.R. § 130.7(b)(6).

## IV. RELEVANT FACTS

### A. 1998 Section 303(d) List

On November 19, 1998, Sailors, Inc. and Mississippi River Revival, two not-for-profit corporations interested in the protection of the environment, filed a complaint against the EPA, alleging noncompliance with the requirements for approval of the Section 303(d)

list in 1998 and prior years. *See Sailors, Inc., et al. v. United States Environmental Protection Agency, et al.*, 98-cv-134-MJM (N.D. Iowa). A similar complaint was filed by the Sierra Club (one of the Plaintiffs in the instant action) on February 25, 1999. *See Sierra Club v. United States Environmental Protection Agency, et al.*, 99-cv-30-MJM (N.D. Iowa). The two actions were consolidated by order of the Court filed on April 8, 1999.

On December 17, 2001, the Court filed a Consent Decree, reflecting an agreement entered into between the parties to settle the cases. The Consent Decree identified 157 waterbodies on Iowa's 1998 303(d) list and attached a schedule for establishing TMDLs for the impaired waters over the next 10 years.[6] The EPA is required to submit an annual report to Plaintiffs and the Court "detailing EPA's progress in meeting the commitments of this Consent Decree." In addition, the parties agreed to meet annually "to discuss any WQLSs that, pursuant to paragraph 5.A(2)b of the Consent Decree, EPA determines do not need TMDLs or are removed from Iowa's 1998 Section 303(d) list by a future list."

### B. 2002 Section 303(d) List

The State's 2002 Section 303(d) list was submitted to EPA on December 17, 2002.[7] *See* Plaintiffs' Appendix C (docket number 33-4). (AR0200158-214) The cover letter accompanying the Section 303(d) list noted that it was prepared pursuant to a recently-enacted state law.

> Iowa's 2002 Section 303(d) list is the first to be developed under a new state law passed by the Iowa Legislature in 2000. This law requires that listing decisions be based on scientifically valid chemical, physical, or biological data collected under a scientifically accepted sampling and analysis plan, including quality control and quality assurance procedures. The [Iowa] Department [of Natural Resources]

---

[6] A list of the 159 waterbodies found on Iowa's final approved 1998 Section 303(d) list is found at Plaintiffs' Appendix A (docket number 33-2).

[7] Due to regulatory changes, a Section 303(d) list was not required for 2000.

> believes this "credible data" law can be implemented in
> conjunction with the federal listing requirements to use all
> readily available and existing water quality related data and
> information.

(AR0200158)

The 2002 Section 303(d) list contained 136 waterbodies.[8] The State's 2002 list did not include seventy-one waterbodies found on the 1998 Section 303(d) list. *See* Plaintiffs' Appendix B (docket number 33-2). (AR0401516-1522) Also included in the report, however, was waterbody-specific rationale for those waterbodies and impairments on the 1998 303(d) list, but not included on the 2002 303(d) list. *See* EPA Exhibit 2 (docket numbers 42-5 and 42-6). (AR0200184-213) Under separate cover, the State provided the EPA with a description of its methodology for developing the 2002 Section 303(d) list. (AR0200221-284)

The EPA partially approved and partially disapproved the 2002 Section 303(d) list. (AR0205979-5996) The EPA approved the "delisting" of waterbodies previously found on the 1998 list, finding that the methodology employed by the State demonstrated good cause for not including those waterbodies on the 2002 list. According to the Summary to Support EPA's Decision:

> Good cause includes, but is not limited to, more recent or
> accurate data, more sophisticated water quality modeling,
> flaws in the original analysis that lead to the water being listed,
> or changes in conditions. The State has demonstrated to
> EPA's satisfaction good cause for not including on the 2002
> list a number of waterbodies which were on the EPA-approved
> 1998 list. Iowa has provided waterbody specific rationales to
> explain its reasoning for removing each waterbody from the
> State's list. EPA has reviewed each rationale and concluded
> that Iowa has provided good cause for removing the
> waterbodies identified in Enclosure 2 from its 2002 list.

EPA Exhibit 3 at 6-7 (docket number 42-7 at 8-9). (AR0205985-86)

---

[8]Parts One and Five of the list submitted on December 17, 2002. (AR0200160-183)

In addition to removing waterbodies listed in 1998, the State added twenty-eight lakes to the 2002 list and removed twenty lakes. The EPA agreed with the State's decision to add the additional lakes to its 2002 Section 303(d) list. EPA further concluded, however, that it was not appropriate to remove the twenty lakes from the list at that time. *See* EPA Exhibit 3 at 8 (docket number 42-7 at 10). (AR0205987) After reviewing public comments on its decision, however, EPA agreed that two of the additional lakes could be removed from the 2002 Section 303(d) list, while the remaining eighteen lakes would remain on the list. *See* EPA Exhibit 4 (docket number 42-8). (AR0206029-30)

### C. 2004 Section 303(d) List

On May 26, 2005, the State of Iowa submitted its 2004 Section 303(d) list. (AR0400081-82) The State utilized an "Integrated Report" format recommended by the EPA.[9] While the Integrated Report format was not required, EPA encouraged its use, suggesting that "[u]se of the five-part Integrated Report format provides the public and other interested stakeholders a comprehensive summary of the water quality status of all of the State's waters." (AR0402778) The Integrated Report format places all waterbodies found in the state in five categories, ranging from Category 1, where "all designated uses are met," to Category 5, where "water is impaired or threatened and a TMDL is needed." (AR0402780) Using this methodology, Category 5 constitutes the Section 303(d) list that the EPA is required to approve or disapprove under the Clean Water Act.

Utilizing this approach, the State listed 218 waterbodies on its 2004 Section 303(d) list. *See* Plaintiffs' Appendix D (docket number 33-5). (AR0400406-452) The State delisted fifty-one waterbodies found on the 2002 Section 303(d) list when submitting its 2004 list. In addition, it provided EPA with an explanation regarding the omitted waters. *See* EPA Exhibit 5 (docket number 42-9). (AR0400326-359)

---

[9] *See* Guidance for 2004 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d) and 305(b) of the Clean Water Act, EPA Exhibit 1 (docket numbers 42-3 and 42-4). (AR042775-2809)

In a letter dated November 14, 2005, EPA partially approved and partially disapproved the State's 2004 Section 303(d) list.

> EPA disapproves IDNR's decision not to list 20 waterbodies and associated pollutants. Specifically, EPA is disapproving the removal by IDNR of six waterbodies or pollutants from the State's list and is restoring those to the State's list. EPA is also adding 14 waterbodies and any associated pollutants to Iowa's list of impaired waters.

EPA Exhibit 6 (docket number 42-10 at 2-3). (AR0400002-3) A listing of the waterbodies to be added to the 2004 303(d) list was attached. *Id.* at 4-7. (AR040004-7) Following public comments, EPA agreed to remove three water segments which it had originally added, including Buffalo Creek, the South Skunk River, and the East Fork Wapsipinicon River. *See* EPA Exhibit 7 (docket number 42-12). (AR0401980-401990)

## V. STANDARD OF REVIEW

The Clean Water Act does not establish a standard for judicial review. Accordingly, the Court applies the standard set forth in the Administrative Procedure Act. *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 496-497 (2004) ("Because the [Clean Air] Act itself does not specify a standard for judicial review in this instance, we apply the familiar default standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and ask whether the Agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'").

Review under the arbitrary and capricious standard is deferential. *National Ass'n of Home Builders v. Defenders of Wildlife*, ___ U.S. ___, 127 S. Ct. 2518, 2529 (2007). The Court will not vacate an agency's decision unless it

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Eighth Circuit Court of Appeals has stated that its review standard requires it to give agency decisions "a high degree of deference." *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (citing *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001)).

> We review whether the agency's decision was "based on consideration of the relevant factors and whether there has been a clear error of judgment." If an agency's determination is supportable on any rational basis, we must uphold it. This is especially true when an agency is acting within its own sphere of expertise.

*Voyageurs*, 381 F.3d at 763 (internal citations omitted).

## VI. ANALYSIS

In the Brief filed in support of their Complaint, Plaintiffs enumerate four claims:

1. EPA's approval of Iowa's 2004 303(d) list failed to consider important facts and information.
2. EPA's approval of Iowa's 2004 303(d) list improperly addressed Iowa's credible data law.
3. EPA's approval of Iowa's 2004 303(d) list was based on water quality standards that were contrary to the Clean Water Act.
4. EPA's approval of Iowa's 2004 303(d) list improperly allowed Iowa to exclude from the 303(d) list waters "assessed," but not "monitored," as impaired.

The Court will address each of the claims in turn.

### A. Did EPA Fail to Consider Important Facts and Information?

In arguing that EPA failed to consider important facts and information when it partially approved Iowa's 2004 Section 303(d) list, Plaintiffs argue that (1) the 2002 Section 303(d) list was defective because it failed to incorporate all of the waterbodies found in the 2002 Section 305(b) report, and (2) that it failed to include waters which did not meet water quality standards, but where no pollutants had been identified. In addition,

Plaintiffs argue (3) that EPA's approval of the delisting of certain waters was not supported by the record.

### 1. Failure to Include Waters Listed on the Section 305(b) Report

In addition to filing a Section 303(d) list, states are also required to file a so-called Section 305(b) report. 33 U.S.C. § 1315(b). These reports must include a description of the water quality of all navigable waters in the state, an analysis of the extent to which the waters provide for beneficial uses, an analysis of the extent to which the elimination of the discharge of pollutants have affected water quality, an estimate of the environmental and economic impact, and "a description of the nature and extent of nonpoint sources of pollutants, and recommendations as to the programs which must be undertaken to control each category of such sources, including an estimate of the costs of implementing such programs." 33 U.S.C. § 1315(b)(1)(A-E). Unlike Section 303(d) lists, however, EPA does not approve a state's Section 305(b) report. Instead, EPA transmits the Section 305(b) reports to Congress biennially, together with EPA's analysis of the reports. 33 U.S.C. § 1315(b)(2).

Plaintiffs complain that the 2002 Section 303(d) list did not incorporate "all of the water bodies that were identified as not fully supporting their designated uses" in the 2002 Section 305(b) report.[10] (The State's final Section 305(b) report is found at AR0201639-2593.) According to Plaintiffs, sixty-seven of the waterbodies listed on the 2002 Section 305(b) report are identified as "not supporting their designated uses, only partially supporting those uses, or the uses were threatened."[11] Therefore, according to Plaintiffs, "these waters should have been placed on the 303(d) list."

EPA argues, on the other hand, that simply because a waterbody has been identified as impaired in the Section 305(b) report does not mean that it must automatically be

---

[10] *See* Plaintiffs' Brief in Support of Complaint for Judicial Review of Administrative Action (docket number 33) at 16.

[11] *See Id.* at 17.

included on the Section 303(d) list. EPA regulations require that in developing the Section 303(d) list, the State must consider, among other things, "[w]aters identified by the State in its most recent section 305(b) report as 'partially meeting' or 'not meeting' designated uses or as 'threatened.'" 40 C.F.R. § 130.7(b)(5)(i). When submitting its Section 303(d) list, each state must provide EPA with documentation which includes, at a minimum, "[a] rationale for any decision to not use any existing or readily available data and information for any one of the categories of waters as described in § 130.7(b)(5)." 40 C.F.R. § 130.7(b)(6)(iii).

In other words, in compiling its Section 303(d) list, the State must consider the impaired waters found on its Section 305(b) report. If the State does not use its 305(b) report in compiling its Section 303(d) list, then it must provide documentation to EPA regarding its rationale for not doing so. Here, EPA argues that sufficient rationale was provided for the excluded waters.

The waterbody-specific rationale for those waterbodies and impairments on the 1998 303(d) list, but not included on the 2002 303(d) list, are set forth in EPA Exhibit 2 (docket numbers 42-5 and 42-6). (AR0200184-213) The rationale submitted by IDNR are generally summarized as "new data," "flaws in analysis," "new modeling data," and "new conditions." The EPA's responses to the delistings are found at AR0201611-1634. In their Reply Brief, Plaintiffs identify thirty-eight waterbodies removed from the 1998 list, for which they claim the required rationale was lacking.

For example, in deciding not to include Bays Branch (the first waterbody listed in Plaintiffs' Reply Brief) in its 2002 303(d) list, IDNR explained its rationale as follows:

> Bays Branch was placed on the 303(d) list in 1998 based on an assessment from 1994. This assessment was based only on best professional judgement [sic] of DNR biologists. This 1994 assessment was "rolled over" from 1994 to 1996 and also for the 1998 305(b) report. Based on the flaws in the original analysis, including the lack of any water quality data or water quality criteria upon which to base an assessment of

13

the aquatic life uses of this wetland, the siltation impairment at
Bays Branch will not be included on the 2002 303(d) list.

EPA Exhibit 2 (docket number 42-5) at 5. (AR0200185)

In approving IDNR's decision to delist Bays Branch, EPA explained:

Originally listed based on comment in Iowa 305(b) assessment
database. EPA does not have site specific documentation nor
studies to confirm that this water is not meeting WQS.

EPA Exhibit 9 (docket number 42-14) at 3. (AR0201612)

Thus, in deciding not to include Bays Branch in its 2002 Section 303(d) list, IDNR
identified flaws in the original analysis "including the lack of any water quality data or
water quality criteria upon which to base an assessment of the aquatic life uses of this
wetland." EPA Regulations specifically identify "flaws in the original analysis" as "good
cause" not to include a water which had previously been identified on a Section 305(b)
report. 40 C.F.R. § 130.7(b)(6)(iv). The EPA found this explanation to be satisfactory.
Plaintiffs argue that this explanation should have been rejected by EPA. In determining
whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law," the Court must give the agency decision "a high degree of
deference." *Voyagers*, 381 F.3d at 763. The Court cannot say on the record presented
here that there has been "a clear error of judgment." *Id.* Accordingly, the Court finds
that EPA's decision to approve the exclusion of Bays Branch must be affirmed.[12]

### 2. Failure to Include Waters Where No Pollutants Had Been Identified

Next, Plaintiffs object to EPA's failure to include on the 2002 Section 303(d) list
those waterbodies which are impaired by "pollution," rather than "pollutants," as set forth
in Part Two of Iowa's Final 2002 Impaired Waters List.[13] *See* Plaintiffs' Appendix C

---

[12]The Court will not comment on each of the sixty-seven waterbodies listed on the
2002 Section 305(b) report, which Plaintiffs claim were erroneously omitted from the 2002
Section 303(d) list. A similar analysis, however, is applicable in each case.

[13]Due to the constantly evolving format for the report on the condition of navigable
(continued...)

(docket number 33-4) at 12-17. Plaintiffs argue that "[a]ll waters that do not meet water quality standards or support their designated uses must be placed on the 303(d) list, no matter what the cause of the impairment," citing 33 U.S.C. § 1313(d)(1)(A). EPA argues, on the other hand, that impaired waters should not be included on the Section 303(d) list where the impairment is not caused by pollutants.[14]

The 1972 Amendment to the Clean Water Act required the establishment of "effluent limitations for point sources" and, for publicly owned treatment works, "effluent limitations based upon secondary treatment." 33 U.S.C. § 1311(b)(1)(A) and (B). The term "effluent limitation" means any restriction "on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11). The Section 303(d) list is a list of those waters which each state has identified within its boundaries, where "the effluent limitations required by Section 1311(b)(1)(A) and Section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A). For each of the waters identified in the Section 303(d) list, the State must establish "the total maximum daily load, for those pollutants which the Administrator identifies under Section 1314(a)(2) of this title as suitable for such calculation." 33 U.S.C. § 1313(d)(1)(C).

---

[13](...continued)
waters, the various categories have been reported in a variety of ways. In 2002, Part Two of the Impaired Waters List identified waters impaired by "pollution," but not by a specific "pollutant." *See* Plaintiffs' Appendix C (docket number 33-4) at 12-17. In 2004, however, Category 4c of the Integrated Report identified waterbodies where the impairment is not caused by a "pollutant." *See* Iowa's 2004 Integrated Report (AR0400396-398).

[14]"The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

Thus, the Section 303(d) list consists of those waters not meeting the applicable water quality standard, despite the establishment of effluent limitations on the discharge of pollutants from point sources. Under those circumstances, the State must establish a TMDL for the responsible pollutants. When establishing the TMDL, the State must consider not only pollutants emanating from point sources, but also "loading" resulting from nonpoint sources and "natural background." 40 C.F.R. § 130.2(i). If the water quality impairment is not caused by a pollutant not adequately controlled by effluent limitations, however, then it need not be listed on the Section 303(d) list and a TMDL is not required pursuant to Section 1313(d)(1)(C).

In support of their argument, Plaintiffs cite *Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002). The issue there, however, was whether the pollutants emanated from point sources or nonpoint sources. Plaintiffs challenged EPA's authority to impose TMDLs on rivers polluted only by nonpoint sources of pollution. *Id.* at 1130. The Court concluded that a water must be included on the Section 303(d) list and a TMDL prepared, even though it is polluted only by nonpoint sources of pollution. *Id.* at 1140-1141. In the instant action, however, the issue is not whether the pollutants emanate from "point sources" or "nonpoint sources," but whether a waterbody must be included on the Section 303(d) list and a TMDL prepared, when no "pollutant" has been identified.[15]

The Court concludes that EPA properly determined that where the water quality impairment is not caused by pollutants, the waters need not be included on the Section 303(d) list. Since the impairment of Bays Branch is due to siltation, for example, it need

_____

[15]Part 2 of Iowa's Final 2002 Impaired Waters List identifies the causes of the impairment as "flow alterations," "exotic species," and "habitat alterations." Plaintiffs' Appendix C (docket number 33-4) at 12-17. Category 4c of Iowa's 2004 Integrated Report identifies the "primary cause[s]" of the impairment as "flow alteration," "other habitat alterations," "unknown toxicity," "nutrients," "siltation," and "exotic species." (AR0400396-398)

not be included on the Section 303(d) list. Accordingly, Plaintiffs are not entitled to relief on this ground.

### 3. Justification for Delisting of Certain Waters

Plaintiffs also argue that the administrative record does not support EPA's conclusion that IDNR provided sufficient waterbody-specific rationale for removing seventy-one waterbodies found on the 1998 Section 303(d) list from the 2002 Section 303(d) list. In support of their argument, Plaintiffs adopt the written comments submitted by the Iowa Environmental Council ("IEC") to EPA, dated August 18, 2003. (AR0206157-6181) The IEC[16] listed forty-two waterbodies which, in the view of IEC, had been approved by EPA for delisting without "good cause." For example, regarding Bays Branch, the IEC commented:

> Since 1994, Bays Branch has been assessed as partially supporting aquatic life uses with the primary source of impairment being siltation from agricultural nonpoint sources. This assessment was reviewed and approved by the Iowa DNR Wildlife Bureau in 1998 and the waterbody was placed on Iowa's list of impaired waters in 1998 by EPA. The 305(b) assessment of partial support of aquatic life uses impaired by siltation was reviewed and approved by the DNR in 2000 and again in 2002. The 2002 Section 305(b) assessment report states the following: "According to the local DNR Wildlife Biologist (Munkel), this wetland remains impaired by siltation from agricultural nonpoint sources. The following beneficial uses are impacted by this siltation problem: Water storage capacity of the impoundment, water quality, game fish populations, recreational fishing, boating recreation, and waterfowl hunting." Based on this assessment, the siltation impairment of Bays Branch should not be delisted, but should remain on the 2002 list. **Please comment why EPA accepts the above assessment as meeting the good cause**

---

[16]The IEC describes itself as "an alliance of seventy-nine organizations, at-large board members from business, farming, the sciences and education, and over six hundred individual members."

> **justification for removal of this waterbody from the Iowa list.**

AR0206173 (emphasis in original).

EPA regulations require each state to provide documentation to EPA "to support the State's determination to list or not to list its waters." 40 C.F.R. § 130.7(b)(6). Upon request by EPA, each state must demonstrate "good cause" for not including a waterbody on the list. 40 C.F.R. § 130.7(b)(6)(iv). "Good cause includes, but is not limited to, more recent or accurate data; more sophisticated water quality modeling; flaws in the original analysis that lead to the water being listed in the categories in § 130.7(b)(5); or changes in conditions, e.g., new control equipment, or elimination of discharges." *Id.*

The 2002 Section 303(d) list submitted by IDNR did not include seventy-one waterbodies that had been included on the 1998 Section 303(d) list. In support of its decision to delist those waters, on December 17, 2002, IDNR submitted waterbody-specific rationale for those waterbodies and impairments on the 1998 303(d) list, but not included on the 2002 303(d) list. *See* EPA Exhibit 2 (docket numbers 42-5 and 42-6) (AR0200184-213).[17] At EPA's request, on April 3, 2003, IDNR supplemented its rationale for delisting certain waters. (AR0200893-937) On July 10, 2003, EPA approved the 2002 Section 303(d) list in part, and disapproved the list in part, as described in the "Summary to Support EPA's Decision: 2002 Iowa 303d List." EPA Exhibit 3 (docket number 42-7). (AR0205979-5996) Following public comments, a final decision was issued by EPA on November 19, 2003. *See* EPA Exhibit 4 (docket number 42-8). (AR0206029-6033)

Similarly, Plaintiffs object to EPA's approval of Iowa's 2004 303(d) list. While eighteen waterbodies were added to the 2004 list, other waters were removed. *See* EPA

---

[17]The rationale provided by IDNR for Bays Branch, for example, is set forth in Part VI(A)(1) above.

Exhibits 6 (docket number 42-10 and 42-11) and 7 (docket number 42-12). (AR0400002-72 and AR0401980-1990).

Plaintiffs have the burden of showing that EPA's decision to approve the State's Section 303(d) list was arbitrary or capricious. *South Dakota v. U.S. Dept. of Interior*, 423 F.3d 790, 800 (8th Cir. 2005). As set forth in Part V above, the Court's standard of review under these circumstances "is a narrow one." *Sierra Club v. Davies*, 955 F.2d 1188, 1192-93 (8th Cir. 1992). The Court cannot substitute its judgment for that of the agency. *Id.*

The Court concludes that the Plaintiffs have fallen far short of meeting their burden of proof. The shotgun approach adopted by Plaintiffs--objecting to every instance where EPA approved the delisting of a waterbody--provides the Court with little guidance in determining how Plaintiffs believe that EPA abused its discretion or otherwise failed to consider the information provided to it. *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) ("When the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.'"). Instead, Plaintiffs simply cite a few pages in the Administrative Record and ask the Court to determine where EPA's decision-making falls short. *See South Dakota v. U.S. Dept. of Interior*, 423 F.3d 790, 800 (8th Cir. 2005) (Plaintiffs "may not simply point to the end result and argue generally that it is incorrect."). The Court is unable to discern any "clear error of judgment" or a lack of "any rational basis" in EPA's determinations and, therefore, its decision must be upheld. *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004).

### B. Did EPA's Approval Improperly Address Iowa's Credible Data Law?

In 2000, the Iowa Legislature adopted a bill entitled "Initiative on Improving Our Watershed Attributes (I on IOWA)," which included provisions commonly referred to as the Credible Data Law. Acts 2000 (78 G.A.) ch. 1068, §§ 10-12. The Credible Data

Law, codified at Iowa Code § 455B.193-.195, places limits on the data which may be used for, among other things, "[d]etermining whether any water of the state is to be placed on or removed from any section 303(d) list." Iowa Code § 455B.194(1)(c).

"Credible data" is defined in the Iowa Code as scientifically valid monitoring data "collected under a scientifically accepted sampling and analysis plan." § 455B.171(4). Data more than five years old, however, is presumed not to be credible "unless the department identifies compelling reasons as to why the data is credible." *Id.* Furthermore, the data is not credible "unless the data originates from studies and samples collected by the department, a professional designee of the department, or a qualified volunteer." § 455B.193(1). Credible data is not required, however, for any Section 305(b) report or other classification. § 455B.194(2).

EPA concedes that Iowa's Credible Data Law places greater restrictions than federal regulations on the information which may be considered in compiling the Section 303(d) list. For example, EPA regulations require the states to assemble "all existing and readily available water quality-related data and information." 40 C.F.R. § 130.7(b)(5). Thus, federal regulations require consideration of data which is "existing and readily available," while Iowa's Credible Data Law would prohibit the consideration of that data if it is more than five years old, or gathered by other than authorized persons.

EPA recognized that IDNR's proposed Section 303(d) lists in 2002 and 2004 were being prepared pursuant to the more restrictive requirements, however, and therefore it sought additional information. In a letter from Leo J. Alderman of EPA to Jack Riessen of IDNR, dated September 25, 2002, Mr. Alderman stated:

> It is our understanding that the Iowa's draft Clean Water Act (CWA) Section 303(d) List is currently out for public comment. We also understand that Iowa has developed its draft list, in part, based on the requirements of Iowa's "credible data" law. We wish to reiterate EPA's position that the removal of a waterbody, previously included on the EPA approved 1998 Iowa 303(d) List, will be reviewed by EPA on a case by case basis in accordance with existing federal

regulations. EPA will review 303(d) Lists based on 40 CFR
§ 130.7. In the event that a water body listed on the
previously approved 303(d) list is removed from Iowa's 2002
303(d) List, Iowa will have to demonstrate "good cause" for
such removal.

(AR0200152-153) In comments supporting its final decision on Iowa's 2002 Section
303(d) list, EPA noted that "[n]either the CWA nor its implementing regulations require
EPA to approve a State's 303(d) listing methodology." (AR0206032) Furthermore, EPA
recognized that "[w]hen considering information for listing purposes EPA's decisions are
based on Federal statute and regulations." (AR0206033) Accordingly, there is no
evidence that EPA improperly considered Iowa's Credible Data Law, or failed to apply
federal statutes and regulations, in reaching final approval of the Section 303(d) lists.

## C. Was EPA's Approval Contrary to the Clean Water Act?

Next, Plaintiffs argue that Iowa's water quality standards do not comply with the
Clean Water Act. Therefore, according to the argument, "[i]t was arbitrary and capricious
for EPA to approve 303(d) lists that did not comply with the Clean Water Act."[18] EPA
responds that while IDNR submitted new water quality standards to EPA for approval, no
action has yet been taken on the submission and, therefore, EPA must review the Section
303(d) lists using the current standards.

In their brief, Plaintiffs refer to a Sierra Club website which describes the alleged
deficiencies in Iowa's water quality standards.[19] It is undisputed that IDNR has submitted
new water quality standards to EPA for approval. Plaintiffs argue that "Iowa's 2002 and
2004 303(d) lists were based on these illegal water quality standards" and therefore EPA's
approval of the lists was "arbitrary and capricious." According to Plaintiffs,

---

[18] *See* Plaintiffs' Brief in Support of Complaint for Judicial Review Administrative
Action (docket number 33) at 33.

[19] Despite repeated efforts, the Court's attempt to open the website was
unsuccessful.

> [i]f the existing water quality standards did not comply with the law and regulations, EPA should simply not have approved the 303(d) list until Iowa had promulgated and EPA approved acceptable water quality standards. Or, in the alternative, EPA should have promulgated new water quality standards for Iowa, pursuant to 33 U.S.C. § 1313(c)(4)(B), before it approved Iowa's 303(d) list.

Plaintiffs' Brief in Support of Complaint for Judicial Review of Administrative Action (docket number 33) at 33. Plaintiffs do not, however, cite any authority for that argument.

The Clean Water Act requires each state to adopt water quality standards "to protect the public health or welfare, enhance the quality of water, and serve the purposes of [the Clean Water Act]." 33 U.S.C. § 1313(c)(2)(A). Section 303(d) requires each state to identify those waters for which effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A). While the Clean Water Act requires states, at least once every three years, to "hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards," 33 U.S.C. § 1313(c)(1), Plaintiffs cite to no authority which requires EPA to apply water quality standards which have not yet been adopted.[20] Rather, Section 303(d) suggests that the list applies to waters determined to be impaired after reference to any water quality standard "applicable to such waters."

The Court concludes that IDNR was required to prepare its Section 303(d) lists based upon the water quality standards which were applicable to the various waters at the

---

[20]Whenever a state revises or adopts a new standard, the revised or new standard must be submitted to the EPA. 33 U.S.C. § 1313(c)(2)(A). If the EPA determines that the proposed standard meets the requirements of the Clean Water Act, then "such standard shall thereafter be the water quality standard for the applicable waters of that State." 33 U.S.C. § 1313(c)(3). *See also Florida Public Interest Research Group Citizen Lobby, Inc. v. Environmental Protection Agency*, 386 F.3d 1070, 1074 (11th Cir. 2004) ("Any existing water quality standard 'remains the applicable standard until the EPA approves a change, deletion, or addition to that water quality standard, or until the EPA promulgates a more stringent water quality standard.'") (quoting 40 C.F.R. § 131.21(e)).

time the list was prepared. That is, Section 303(d) directs the State to identify those waters which are not compliant with the water quality standard applicable to such waters. If a revised water quality standard has not yet been approved by EPA, then it is not yet applicable to the various waters and IDNR would not be justified in applying the proposed revised standard in compiling the Section 303(d) list. Therefore, IDNR properly compiled the lists using the existing water quality standards and EPA acted in accordance with the law by not applying some other unapproved standard.

### D. Did EPA's Approval Improperly Exclude "Evaluated" Waters?

Finally, Plaintiffs argue that IDNR improperly excluded impaired waters from its Section 303(d) list when the impairment was determined following an "evaluated assessment," rather than a "monitored assessment."[21] The distinction between "evaluated waters" and "monitored waters" is described by IDNR as follows:

> Evaluated waters are
>> those for which the use support decision is based on water quality information other than current site-specific data such as data on land use, location of sources, predictive modeling using estimated input values, and some questionnaire surveys of fish and game biologists. As a general rule, if an assessment is based on older ambient data (e.g., older than five years), the State should also consider it "evaluated."
>> For example, water quality assessments based on results from only a few grab samples or on professional judgment of local biologists would be considered "evaluated" assessments.
> Monitored waters are
>> those waterbodies for which the use support decision is principally based on current, [five

---

[21] In their Brief (docket number 33), Plaintiffs distinguish between "monitored" and "assessed" waters. In their Reply Brief (docket number 45), however, Plaintiffs make it clear that their initial reference to "assessed" waters was intended to be a reference to "evaluated" waters.

years old or less] site-specific ambient monitoring data believed to accurately portray water quality conditions. Waters with data from biosurveys should be included in this category along with waters monitored by fixed-station chemical/physical monitoring or toxicity testing. To be considered "monitored" based on fixed-station chemical/physical monitoring, waters generally should be sampled quarterly or more frequently.

(AR0400824)

For its part, EPA repeats that it does not approve or disapprove the methodology used by the State in preparing the Section 303(d) lists. Rather, EPA applies federal statutes and regulations in determining whether a waterbody was properly omitted. EPA notes that Plaintiffs have failed to refer to anywhere in the record which indicates that EPA applied the distinction used by IDNR. In their Reply Brief, Plaintiffs argue that "there is nothing in the record to show that EPA disregarded the distinction in reviewing and approving the 303(d) list."[22] Plaintiffs have the burden of proof in this regard, however, and the Court concludes that they have failed to show that EPA relied on factors which it was not permitted to consider, *National Ass'n of Home Builders v. Defenders of Wildlife*, ___ U.S. ___, 127 S. Ct. 2518, 2529 (2007), or that its actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 496-97 (2004).

## VII. SUMMARY

When reviewing an agency decision, the Court is required to employ "a high degree of deference." *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004). The Court concludes that Plaintiffs have failed to meet their burden of proving that EPA's decision to approve in part and disapprove in part Iowa's Section 303(d) lists in 2002 and

---

[22]*See* Plaintiffs' Reply Brief (docket number 45) at 24.

2004 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## VIII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court **DISMISS** the Complaint filed by Plaintiffs on August 10, 2006.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B) that within ten (10) days after being served with a copy of these proposed findings and recommendations, any party may serve and file written objections with the District Court.

DATED this 17th day of December, 2007.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA